FILED
2013 Oct-29  AM 08:02
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BARBARA BOBO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV 12-S-1930-NE** |
| | ) | |
| **AGCO CORPORATION** | ) | |
| **f/k/a ALLIS CHALMERS** | ) | |
| **COMPANY (as successor to** | ) | |
| **MASSEY FERGUSON** | ) | |
| **LIMITED),** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Barbara Bobo commenced this action against nine defendants.[1]  Eight of those

were dismissed pursuant to stipulations for dismissal,[2] leaving only her claims against

---

[1] *See* doc. no. 1 (Complaint), asserting claims against: (*i*) Agco Corporation, *formerly known as* Allis Calmers Company, *sued as successor to* Massey Ferguson Limited ("Agco"); (*ii*) CBS Corporation, *formerly known as* Viacom, Inc., *sued as successor-by-merger to* CBS Corporation, *formerly known as* Westinghouse Electric Corporation ("CBS"); (*iii*) Conopco, Inc., *doing business as* Unilever United States, Inc., *sued individually and as successor-by-merger* to Helene Curtis Industries, Inc. ("Conopco"); (*iv*) Consolidated Aluminum Corporation, *also known as* Conlaco, Inc. ("Consolidated Aluminum"); (*v*) Dana Companies LLC, *sued individually and as successor-in-interest to* Victor Gasket Manufacturing Company ("Dana"); (*vi*) Ford Motor Company ("Ford"); (*vii*) Metropolitan Life Insurance Company ("MetLife"); (*viii*) TVA; and (*ix*) Unilever United States, Inc., *sued individually and as successor-by-merger to* Helene Curtis Industries, Inc. ("Unilever").

[2] The following claims were dismissed in accordance with stipulations of dismissal filed by plaintiff and the defendants noted: doc. no. 18 (Ford); doc. no. 19 (Order Dismissing Ford); doc. no. 44 (AGCO); doc. no. 45 (Order Dismissing AGCO); doc. no. 47 (Conopco and Unilever); doc. no. 48 (Order Dismissing Conopco and Unilever); doc. no. 53 (Consolidated Aluminum); doc. no. 56 (Order Dismissing Consolidated Aluminum); doc. no. 60 (CBS); doc. no. 61 (Order Dismissing CBS); doc. no. 62 (Dana Companies); doc. no. 64 (Order Dismissing Dana Companies); doc. no. 78 (MetLife); doc. no. 79 (Order Dismissing MetLife).

the Tennessee Valley Authority ("TVA"). TVA filed two motions for summary judgment. The first is based upon the so-called "discretionary function doctrine."[3] The second motion argues that Mrs. Bobo does not have sufficient evidence to give rise to a genuine issue of material fact: that is, the question of whether her mesothelioma was caused by "exposures to asbestos originating from a TVA-owned facility."[4] Oral argument on those motions and other issues was conducted on May 20, 2013.

Subsequently, on September 17, 2013, while this court was researching the issues addressed in the present opinion, TVA filed notice "of the reported death of Plaintiff Barbara Bobo on September 7, 2013."[5] Rule 25 of the Federal Rules of Civil Procedure speaks to such contingencies, and provides that:

> If a party dies *and the claim is not extinguished*,[6] the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. *If the motion is not made within 90 days after service of a statement noting*

---

[3] *See* doc. no. 69 (TVA's Motion for Summary Judgment on Discretionary Function Grounds).

[4] Doc. no. 122 (TVA's second Motion for Summary Judgment), at 1. The second motion also contends that "TVA owed no duty of care to Plaintiff under Alabama tort law." *Id.*

[5] Doc. no. 169 (Suggestion of Plaintiff's Death).

[6] *See*, *e.g.*, Ala. Code § 6-5-462 (1975) (2005 Replacement Vol.) ("In all proceedings not of an equitable nature, *all claims upon which an action has been filed* and all claims upon which no action has been filed on a contract, express or implied, *and all personal claims upon which an action has been filed*, except for injuries to the reputation, *survive in favor of* and against *personal representatives*; and all personal claims upon which no action has been filed survive against the personal representative of a deceased tort-feasor.") (emphasis supplied).

*the death*, the action by or against the decedent *must be* dismissed.

Fed. R. Civ. P. 25(a)(1) (footnote and emphasis supplied).  Accordingly, this court entered an order directing plaintiff's counsel to substitute the duly-appointed personal representative of the estate of Barbara Bobo, deceased, on or before December 16, 2013, failing which the action would be dismissed.[7]

This court also entered an order granting plaintiff's motion to reconsider the previous denial of her motion for leave to amend her complaint,[8] and directed the Clerk to file plaintiff's "First Amended Complaint."[9]  The amended complaint expands the amount of time during which plaintiff alleges that she was exposed to airborne asbestos fibers brought into her home on the person and clothing of her deceased husband, a former TVA employee, by a period of some twelve years:  that is, from 1975 to 1997, as opposed to the period of 1975 to 1985 alleged in the original complaint.  Even so, the basic principles underlying the issues of law that are addressed in this opinion remain the same, regardless of the beginning and ending dates of the injuries alleged.  For that reason, and based upon the assumption that plaintiff's counsel will file a timely motion to substitute the real party in interest, this

---

[7] *See* doc. no. 172.

[8] *See* doc. no. 71 (Motion for Leave to Amend Complaint), doc. no. 75 (Memorandum Opinion and Order denying motion to amend), doc. no. 77 (Motion for Reconsideration), and doc. no. 170 (Order Granting Motion for Reconsideration).

[9] *See* doc. no. 170, at 2.  *See also* doc. no. 171 (First Amended Complaint).

court proceeds to address TVA's first motion for summary judgment.[10]   Upon consideration of that motion, the parties' briefs, the evidentiary submissions, and the oral arguments of counsel, the court concludes that TVA's motion is due to be granted, but only in part.

## I.  STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 918, 921 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

---

[10]  *See* doc. no. 69 (TVA's Motion for Summary Judgment on Discretionary Function Grounds).

1321, 1324 (11th Cir. 1983).  Additionally,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration supplied);

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS

Barbara Bobo never worked for TVA as an employee, a contractor, or sub-

contractor.  Moreover, she was never permitted to enter the Authority's "Browns

Ferry Nuclear Plant" located on the North shore of the Tennessee River near Athens,

in Limestone County, Alabama.[11]  Instead, her claims are derivative:  that is, they

grow out of the exposure of her late husband, James "Neal" Bobo, to asbestos and

---

[11] *See* doc. no. 70 (Defendant's Brief in Support of Summary Judgment on Discretionary Function Grounds), at 3.  The Browns Ferry plant was TVA's first nuclear power plant, and the largest in the world when it began operation in 1974.  It was the first nuclear plant in the world to generate more than 1 billion watts of power.  The three operating units at Browns Ferry are boiling water nuclear reactors.  They produce electricity by splitting uranium atoms:  *i.e.*, the heat from that process boils water, thereby producing steam that is piped to turbines, which spin a generator to produce electricity. *See*, *e.g.*, http://www.tva.gov/sites/brownsferry.htm (last visited Oct. 17, 2013).

asbestos-containing products while he worked in that facility.[12]

## A.   James Bobo's Exposure to Asbestos

James Bobo was employed by TVA as a laborer at its Browns Ferry Nuclear Plant for more than twenty-two years, from April 15, 1975 until September 7, 1997. During all of that time he was exposed to asbestos and products that contained asbestos fibers, such as thermal pipe coverings, insulation, roofing cement, packing materials, and gasket packing materials.[13]   Laborers such as James Bobo worked all over the nuclear facility, primarily performing clean-up duties.[14]   Mr. Bobo was often directed to assist those TVA employees who installed insulation materials that were made from (or which contained) asbestos.[15]   Occasionally, he would assist the insulators in such work; but, more often than not, Mr. Bobo was directed to clean up

---

[12] *See* doc. no 83-2 (Deposition of James Bobo), at 21-23; doc. no. 83-3 (Deposition of Priscilla Carthen), at 16, 38; doc. no. 74 (Defendant's Brief in Opposition to Plaintiff's Motion to Amend Complaint), at 8.

[13] Doc. no. 83-2 (Deposition of James Bobo), at 34-35.  TVA's 1967 Safety Manual noted that asbestos thermal insulation was used at the plant and that "[e]xposures ocurre[d] during application and removal of insulation."  Doc. no. 91-1, at ECF 5 (alterations supplied).  "ECF is the acronym for Electronic Case Filing, a filing system that allows parties to file and serve documents electronically." *Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 allows citation to "page numbers generated by the ECF header." *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing The Bluebook: A Uniform System of Citation R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* Eds., 19th ed. 2010)). Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[14] Doc. no. 83-4 (Deposition of Jimmy Myhan), at 25-27.

[15] Doc. no. 83-2 (Deposition of James Bobo), at 36.

6

after the insulators had completed their duties by sweeping up the insulation that had fallen on the floor.[16]  The act of sweeping generated airborne dust containing asbestos fibers.[17]  Mr. Bobo also was often present when the insulators mixed asbestos-containing refractory cement.[18]

Significantly, Mr. Bobo did not change clothing at the end of each work day. Instead, he drove to his home wearing the same clothes that he had worked in during the day.[19]

## B.   Plaintiff's Exposure to Asbestos

Although plaintiff, like many Americans above the age of fifty, probably was exposed to products containing some amount of asbestos at various times throughout her life, she alleges that she was involuntarily subjected to an excessive quantity of asbestos while laundering her husband's dusty work clothes at least twice each week throughout the years he worked for TVA at Browns Ferry.[20]  The washroom in

---

[16] *Id.* at 36-38.  The laborers would clean up the insulation using brooms, rags, and mops. Doc. no. 83-4 (Deposition of Jimmy Myhan), at 60.

[17] Doc. no. 83-2 (Deposition of James Bobo), at 34, 100, 109; doc. no. 83-4 (Deposition of Jimmy Myhan), at 61.

[18] Doc. no. 83-2 (Deposition of James Bobo), at 144-45, 147.

[19] Doc. no. 83-4 (Deposition of Jimmy Myhan), at 72.

[20] Doc. no. 1 (Complaint) ¶ 64.  Plaintiff states in her complaint that she experienced exposure to asbestos-containing friction products, as well as other asbestos products, from approximately the 1940s to the late 1950s as a result of her father, a farmer, performing maintenance on his tractors. *Id.* ¶ 12(b).  Additionally, plaintiff "used asbestos-containing stationary hair dryers during her career as a beautician" from 1976 through the decade of the 1990s.  *Id.* ¶ 12(c).  *See also* doc. no. 83-1 (Deposition of Barbara Bobo), at 19.

plaintiff's home was small.  The floor dimensions were only approximately four feet by five feet (20 square feet).[21]  Plaintiff's practice was to pick-up the dirty clothing that her husband removed at the end of a work day, carry those clothes into the washroom, shut the door, empty the pockets, shake the articles, and then place them into the washing machine.[22]  Mrs. Bobo recalled inhaling "dust" while thus laundering her husband's clothes.[23]  She described the air of the laundry room as "[f]oggy. I just thought it was dust."[24]  She also dry-swept and mopped the washroom floor, and she said that the air also became dusty when she swept it.[25]

A physician diagnosed plaintiff as suffering from "pleural mesothelioma" in November of 2011.[26]  "Mesothelioma" is defined as "a tumor derived from mesothelial tissue . . . . Malignant varieties [*e.g.*, *pleural* mesothelioma] are often the result of excessive exposure to asbestos."  *Dorland's Illustrated Medical Dictionary* 1134 (30th ed. 2003) (alteration supplied).  "Pleural mesothelioma" is characterized by the same, generally-accepted treatise as "a malignant mesothelioma of the pleural space, often spreading widely and invading other thoracic structures; . . . It is usually

---

[21] Doc. no. 83-1 (Deposition of Barbara Bobo), at 18.

[22] *Id.* at 19.

[23] *Id.* at 20.

[24] *Id.* at 19 (alteration supplied).

[25] *Id.* at 20.

[26] *Id*. at 40-41.

fatal within one year." *Id*. at 1135.

C.  **The Tennessee Valley Authority**

The Tennessee Valley Authority is a constitutionally authorized corporate agency and instrumentality of the United States. *See* 16 U.S.C. §§ 831-831ee (1933). It provides electricity for more than nine million people in seven southeastern states at prices generally below the national average.   Congress placed broad responsibilities on TVA, both for the nation as a whole and for the Tennessee Valley region. *See United States ex rel. Tennessee Valley Authority v. Welch*, 327 U.S. 546, 553 (1946) ("The broad responsibilities placed on the Authority relate to navigability [of the Tennessee River and its tributaries], flood control, reforestation, [producing fertilizer for] marginal lands, and agricultural and industrial development of the whole Tennessee Valley.") (alterations supplied); *see also United States ex rel. Tennessee Valley Authority v. Three Tracts of Land*, 377 F. Supp. 631, 634 (N.D. Ala. 1974) (observing that "16 U.S.C. § 831n and § 831n-4, indicate that [TVA has] . . . broad responsibilities for the advancement of the national defense and the physical, social and economic development of the area [served by the Authority] . . .") (alterations supplied).[27]

In order to generate revenue to pay for the responsibilities imposed upon TVA

---

[27] *See also*, *e.g.*, http://www.tva.com/abouttva/index.htm (last visited Oct. 17, 2013).

by its enabling Act, the Authority is authorized to "produce, distribute, and sell electric power."  16 U.S.C. § 831d(*l*) (1933); *Three Tracts of Land*, 377 F. Supp. at 634 (noting that Congress intended for TVA to provide "an ample supply of electric power for such purposes").

The Act creating TVA also provides that all real property needed to accomplish the purposes of the Act is held "in the name of the United States of America," and that it is "entrusted to the Corporation as the agent of the United States to accomplish the purposes of the [enabling Act]."  16 U.S.C. § 831c(h) (1933) (alteration supplied). The Browns Ferry nuclear power production facility is one of the many properties entrusted to TVA for the purpose of accomplishing the Authority's missions.[28]

## D.    The Application of Occupational Safety and Health Administration Regulations to TVA

The Occupational Safety and Health Act of 1970 ("the Act") requires federal employers to "establish and maintain an effective and comprehensive occupational safety and health program which is consistent with the standards promulgated under section 6 of [the Act]."  29 U.S.C. § 668 (1970) (alteration supplied).  Executive Order 11,612, promulgated in 1971, observed that, "[a]s the Nation's largest employer, the Federal Government has a special obligation to set an example for safe

---

[28] Doc. no. 70 (Defendant's Brief in Support of Summary Judgment on Discretionary Function Grounds), at 7.

and healthful employment."   36 Fed. Reg. 13,891 (July 26, 1971) (alteration supplied).   For that reason, the order reiterated that the head of each federal department and agency was required to "establish an occupational safety and health program . . . in compliance with the requirements of . . . section 19(a) of [the Act]," and each such safety program was required to "be consistent with the standards prescribed by section 6 of [the Act]."   *Id.* (alterations supplied).

Another Executive Order issued three years later recognized that "even greater efforts [were] needed."   Executive Order No. 11,807, recorded at 39 Fed. Reg. 35,559 (Sept. 28, 1974) (alteration supplied).   Thus, the 1974 order was designed to provide additional guidance to ensure effective occupational safety and health programs within executive agencies, and to allow for detailed evaluations of such programs by the Secretary of the Department of Labor.   *Id.*

It was not until the promulgation of Executive Order 12,196 in February of 1980, however, that federal executive agencies were specifically required to comply with the regulations of the Occupational Safety and Health Administration ("OSHA").   *See* 45 Fed. Reg. 12,769 (Feb. 26, 1980) (providing that the head of each agency must "[c]omply with all standards issued under section 6 of [the Act] . . .") (alterations supplied).

E.      **The Evolution of OSHA Standards**

11

OSHA promulgated an emergency temporary standard for exposure to asbestos fibers under § 6 of the Act in 1971.  *See* 29 C.F.R. § 1910.93a (1971), *recodified as* 29 C.F.R. § 1910.1001 (1975).  The temporary standard provided that an employee's exposure could "not exceed 5 fibers per milliliter greater than 5 microns in length" over an eight-hour, time-weighted average, and could not exceed a peak concentration level of 10 fibers per milliliter.  29 C.F.R. § 1910.93a(a).  The airborne concentration level of asbestos was to be determined by "the membrane filter method at 400-450x magnification (4 millimeter objective) phase contrast illumination."  *Id*.

The exposure limits stated in the 1971 temporary standard became final in 1972, when OSHA notified employers to prepare for the following reductions in exposure limits that were to take effect, initially, on July 7, 1972, and then be further reduced four years thereafter, on July 1, 1976:

> (b) *Permissible exposure to airborne concentrations of asbestos fibers* — (1) *Standard effective July 7, 1972.*  The 8-hour time-weighted average airborne concentrations of asbestos fibers to which any employee may be exposed *shall not exceed five fibers*, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.
>
> (2) *Standard effective July 1, 1976.*  The 8-hour time-weighted average air-borne concentrations of asbestos fibers to which any employee may be exposed *shall not exceed two fibers*, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.
>
> (3) *Ceiling concentration.*  No employee shall be exposed at any

12

given time to airborne concentrations of asbestos fibers in excess of 10 fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.

29 C.F.R. § 1910.93a(b) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975)

(emphasis supplied).

Additionally, OSHA laid out requirements for protective equipment and clothing for employees such as Mr. Bobo, who were exposed to airborne concentrations of asbestos fibers that exceed the ceiling level prescribed in Section 1910.93a(b) above.

(d)(3) *Special clothing*:  The employer shall provide, and require the use of, special clothing, such as coveralls or similar whole body clothing, head coverings, gloves, and foot coverings for any employee exposed to airborne concentrations of asbestos fibers, which exceed the ceiling level prescribed in paragraph (b) of this section.

(4) *Change rooms*:  (*i*) At any fixed place of employment exposed to airborne concentrations of asbestos fibers in excess of the exposure limits prescribed in paragraph (b) of this section, the employer shall provide change rooms for employees working regularly at the place.

(*ii*) *Clothes lockers*:  The employer shall provide two separate lockers or containers for each employee, so separated or isolated as to prevent contamination of the employee's street clothes from his work clothes.

(*iii*) *Laundering*: (*a*) Laundering of asbestos contaminated clothing shall be done so as to prevent the release of airborne asbestos fibers in excess of the exposure limits prescribed in paragraph (b) of this section. . . .

29 C.F.R. § 1910.93a(d) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975).

OSHA also mandated a particular method of measuring and monitoring asbestos concentrations in the air.

> (e) *Method of measurement*.  All determinations of airborne concentrations of asbestos fibers shall be made by the membrane filter method at 400-450 x (magnification) (4 millimeter objective) with phase contrast illumination.

> (f) *Monitoring* — (1) *Initial determinations*.  Within 6 months of the publication  of this section, every employer shall cause every place of employment where asbestos fibers are released to be monitored in such a way as to determine whether every employee's exposure to asbestos fibers is below the limits prescribed in paragraph (b) of this section . . . .

> (2) *Personal monitoring* — (*i*) Samples shall be collected from within the breathing zone of the employees, on membrane filters of 0.8 micrometer porossity mounted in an open-face filter holder.  Samples shall be taken for the determination of the 8-hour time-weighted average airborne concentrations and of the ceiling concentrations of asbestos fibers.

> (*ii*) *Sampling frequency and patterns*.  After the initial determinations required by subparagraph (1) of this paragraph, samples shall be of such frequency and pattern as to represent with reasonable accuracy the levels of exposure of employees.  In no case shall the sampling be done at intervals greater than 6 months for employees whose exposure to asbestos may reasonably be foreseen to exceed the limits prescribed by paragraph (b) of this section.

29 C.F.R. §§ 1910.93a(e)-(f) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975).

The 1972 OSHA standard for asbestos exposure further stated that "every employer shall provide, or make available, comprehensive medical examinations to each of his employees engaged in occupations exposed to airborne concentrations of

asbestos fibers."  29 C.F.R. § 1910.93a(j)(3).

## F.   TVA Internal Policies

TVA has a safety organization that is "responsible for establishing TVA policies and procedures for assuring safe and healthful work conditions for all employees on TVA properties (TVA safety practices)."[29]  Such safety practices "are organized generally into three tiers:  agency safety practices established by the TVA safety organization; business unit safety practices established by major business units such as nuclear power . . . ; and site specific safety practices established by local facilities such as Browns Ferry . . . ."[30]  Further, many of those safety practices address specific standards relating to the use of asbestos at TVA properties, such as Browns Ferry.[31]

### 1.   TVA Hazard Control Standard 407

TVA adopted "Hazard Control Standard 407" for asbestos on April 15, 1974.[32] Paragraph 1.0 of that standard stated that it applied "primarily, but not exclusively, to operations where asbestos or insulating material containing asbestos is handled, mixed, sprayed, applied, removed, cut, or scored."[33]  Paragraph 4.1.2 noted that the

---

[29] Doc. no. 68 (Affidavit of Christopher Jeter) ¶ 2.

[30] *Id.* ¶ 3.

[31] *Id.* ¶ 4.

[32] *Id.  See also* doc. no. 68-1 (TVA Hazard Control Standard 407).

[33] *Id*. at 1 (alteration supplied).

following are examples of materials that may contain asbestos:  heat insulating materials; fireproofing materials; transite;[34] limpet fibers;[35] calcium silicate block and pipe insulation; asbestos cement, mortars, wire covers, grouting, paper, blankets, tape, and plaster; and vehicle brake linings.[36]  Paragraph 4.3 prescribed the permissible exposure level for airborne concentrations of asbestos in the following terms:

> 4.3.1  The 8-hour time-weighted average airborne concentration of asbestos fibers to which an employee may be exposed shall not exceed five fibers, each longer than five micrometers, per cubic centimeter of air. (On July 1, 1976, the permissible concentration for asbestos will be reduced from five fibers to two fibers, each longer than five micrometers, per cubic centimeter of air.)
>
> 4.3.2  An employee shall not be exposed for any length of time to airborne concentrations of asbestos fibers in excess of the ceiling limit of 10 fibers, each longer than five micrometers, per cubic centimeter of air without appropriate personal protective equipment as described in paragraph 4.5 of this standard.[37]

Paragraph 4.4 of the Hazard Control Standard provided instructions on the proper use of asbestos containing products:

---

[34] "Transite" originated as a trade name for a line of asbestos-cement products, but over time, it became a generic term for "a hard, fireproof composite material" and "fiber cement boards" that were frequently used in wall construction. Definition of "Transite," Wikipedia, http://en.wikipedia.org/wiki/Transite (last visited Sept. 24, 2013).

[35] "Limpet" was a mixture of cement and asbestos, and it was often used in a spray-form. Geoffrey Tweedale, *5.8 Limpet Asbestos: Spraying Ill-Health World-Wide*, World Asbestos Report, http://worldasbestosreport.org/conferences/gac/gac2000/A5_8~182.pdf (last visited Sept. 24, 2013). It was often used for insulation, sound-proofing, fireproofing, and condensation control. *Id.*

[36] *See* doc. no. 68-1 (TVA Hazard Control Standard 407), at 2.

[37] *Id.* at 2-3.

4.4.1   Engineering controls, except when technically not feasible, shall be utilized to ensure that each individual working with or near materials containing asbestos is not exposed to concentrations of asbestos dust in excess of the permissible limits.  Administrative controls shall be used only if engineering controls are not feasible.

4.4.2   When both respiratory protection and control of exposure time are practicable, control of exposure time shall be used.   The permissible exposure time can be determined by allowing a precalculated length of exposure to airborne concentrations of asbestos above the permissible concentration (but in no case, above the ceiling limit), followed by a comparable period of no exposure.  *Accurate records of exposure times and airborne asbestos concentrations shall be maintained.*

4.4.3   Asbestos and materials containing asbestos shall be handled, mixed, applied, removed, cut, scored, or otherwise used in a wet state (except where impracticable or where the usefulness of the product would be diminished) to prevent airborne concentrations of asbestos fibers in excess of the permissible limits . . . .[38]

Paragraph 4.5 of Hazard Control Standard 407 defined the requirements for personal protective equipment as follows:

4.5.1.1   The use of respiratory protection for controlling employee exposure to asbestos shall be limited to the following conditions:

A.      Prior to implementation of engineering controls or work methods designed to maintain airborne asbestos concentrations within the permissible limits required by paragraph 4.3 of this standard.

B.      Where engineering controls or administrative controls are technically not feasible.

---

[38] *Id*. at 3 (emphasis supplied).

C.      In emergency situations.

D.      *Prior to determining the airborne concentrations of asbestos in a work environment.*

4.5.2   Employees exposed to airborne concentrations of asbestos fibers greater than the ceiling limit shall be provided with and required to use personal protective equipment to protect the eyes, head, hands, feet, and trunk from asbestos . . . . *Protective clothing shall be utilized for exposures of undetermined concentrations until it has been proven by tests that the activity will not produce concentrations above the ceiling limits.*[39]

Paragraph 4.6.2 contained standards for changing rooms, and stated that "[e]ach employee exposed to airborne concentrations of asbestos in excess of the ceiling limit shall be provided with two separate lockers or containers *so separated or isolated to prevent contamination of the employee's street clothes from his work clothes*."[40]

Paragraph 4.7 established requirements for "Personal and Environmental Monitoring," and provided that:

Initial and continuing monitoring shall be performed by the TVA Hazard Control Branch which will *quantitatively determine airborne asbestos fiber concentration in the breathing zone of exposed employees*, and in areas of a work environment which are representative of airborne concentrations which may reach the breathing zone of employees. Eight-hour time-weighted average and ceiling concentrations shall be determined.   Such evaluations shall be accomplished at least semiannually and shall represent with reasonable accuracy the levels of

---

[39] *Id*. at 3-5 (emphasis supplied).

[40] Doc. no 68-1 (TVA Hazard Control Standard 407), at 5 (alteration and emphasis supplied).

18

exposure of employees.[41]

TVA also was required to "maintain records of personal monitoring and environmental monitoring."[42]

Paragraph 4.9, addressing the subject of "Housekeeping," provided that "the use of air jets or dry sweeping to clean up asbestos accumulations is prohibited."[43]

Finally, Paragraph 4.10.2 of Hazard Control Standard 407 mandated that "[e]mployees exposed to airborne concentrations of asbestos fibers shall receive an annual medical examination."[44] Significantly, records of those medical examinations were required to be retained by TVA for twenty years.[45]

### 2.    TVA nuclear power safety and hazard control manual

TVA's Division of Nuclear Power adopted a safety and hazard control manual on May 8, 1978.[46] The threshold limit for airborne asbestos concentrations under the standards of that manual was "five fibers per cubic centimeter, greater than five micrometers in length."[47] Requirement number 4 specified that "[e]mployees exposed

---

[41] *Id*. at 5 (emphasis supplied).

[42] *Id*. at 6.

[43] *Id.*

[44] *Id.* (alteration supplied).

[45] *Id*.

[46] *See* doc. no. 86-4 (Division of Nuclear Power Safety and Hazard Control Manual); doc. no. 68-2 (TVA Asbestos Standards – Browns Ferry Nuclear Plant (1975-1985)).

[47] Doc. no. 86-4 (Division of Nuclear Power Safety and Hazard Control Manual), at ECF 17.

to airborne concentrations of asbestos shall wear an approved respirator and protective coveralls . . . ."[48]   Additionally, Requirement number 12 mandated that "*[e]ach employee exposed to airborne concentrations of asbestos* shall be provided with two separate lockers.   One locker shall be used for street clothes and must not be contaminated with asbestos."[49]

### 3.   Browns Ferry Standard Practice 14.45

Browns Ferry adopted Standard Practice 14.45 on October 15, 1980, a reference point that established site-specific policies and procedures governing the use of asbestos and asbestos-containing materials.[50]   Standard Practice 14.45 set the threshold limit value for airborne asbestos concentrations at "five fibers per cubic centimeter, greater than five micrometers in length."[51]   In addition, Standard Practice 14.45 provided that "[e]mployees exposed to airborne concentrations of asbestos shall wear an approved respirator and protective coveralls . . . ."[52]   Annual medical examinations were also mandated for "employees exposed to airborne concentrations of asbestos fibers."[53]

---

[48] *Id.* (alteration supplied).

[49] *Id.* at ECF 18 (alteration and emphasis supplied).

[50] *See* doc. no. 90-2 (Browns Ferry Nuclear Plant Standard Practice 14.45), at ECF 2; doc. no. 68-2 (TVA Asbestos Standards – Browns Ferry Nuclear Plant (1975-1985)).

[51] Doc. no. 90-2 (Browns Ferry Nuclear Plant Standard Practice 14.45), at ECF 2.

[52] *Id.* (alteration supplied).

[53] *Id.* at ECF 3.

### 4.   1984 memorandum on TVA's asbestos policy

A memorandum entitled "TVA Policy on Asbestos" established "additional requirements to better protect employees from exposure to asbestos fibers."[54]  The first requirement lowered the agency target for asbestos to "no more than 0.5 fibers, longer than 5 micrometers, per cubic centimeter of air (f/cc) as the permissible 8-hour time-weighted average (TWA) airborne concentration of all forms of asbestos.  The ceiling level will be lowered from 10 f/cc to 5 f/cc."[55]  Employees who could "reasonably be expected to be exposed above a TWA of .1 fiber/cc" were to be identified, given initial and annual training, and offered medical examinations.[56]

## III.  DISCUSSION

Generally speaking, the so-called "discretionary function doctrine" arises in the context of claims brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, 1346(b) (1946).  *Mays v. Tennessee Valley Authority*, 699 F. Supp. 2d 991, 1006 (E.D. Tenn. 2010).  The FTCA "waived the sovereign immunity of the United States for certain torts committed by federal employees."  *Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 475 (1994) (citing 28 U.S.C. § 1346(b)).  Even so, the FTCA's waiver of sovereign immunity *does not extend to*

---

[54] *See* doc. no. 90-3 (Memorandum by W.F. Willis), at 1; doc. no. 68-2 (TVA Asbestos Standards – Browns Ferry Nuclear Plant (1975-1985)), at 1.

[55] Doc. no. 90-3 (Memorandum by W.F. Willis), at 1.

[56] *Id*. at 2.

21

"[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform *a discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a) (1948) (alteration and emphasis supplied).  *See also Mays*, 699 F. Supp. 2d at 1006.  However, as the U.S. District Court for the Eastern District of Tennessee observed in the *Mays* opinion,

> *TVA does not benefit from the discretionary function doctrine as it is embodied in the FTCA.*  Rather, TVA's waiver of sovereign immunity is through the "sue and be sued" clause in its own enabling legislation. In addition to the articulation of specific powers and purposes in the TVA Act, the Act also provides that TVA "[m]ay sue or be sued in its corporate name."  16 U.S.C. § 831c(b).

*Id.* at 1006 (emphasis supplied, alteration in original).

Moreover, the same section of the FTCA that carves out the discretionary function exception to the government's waiver of sovereign immunity specifically provides that the provisions of 28 U.S.C. § 1346(b)[57] shall not apply to "[a]ny claim

---

[57] The pertinent portion of this statute provides that, subject to the Tort Claims Procedures contained in chapter 171 of Title 28 of the United States Code, the district courts of the United States

> shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1) (ellipses supplied).

arising from the activities of the Tennessee Valley Authority."  28 U.S.C. 2680(*l*)

(alteration supplied).  As the Fourth Circuit observed, Congress expressly exempted

TVA from the FTCA "because it intended that legal claims 'be exercised against the

Tennessee Valley Authority *exactly as they could have been exercised against . . .*

*private utility companies.*'"  *North Carolina ex rel. Cooper v. Tennessee Valley*

*Authority*, 515 F.3d 344, 349 (4th Cir. 2008) (quoting 79 Cong. Reg. 6563-64 (1946)

(statement of Sen. Hill)) (emphasis supplied).

Nevertheless, the Supreme Court and the Eleventh Circuit have both held that

the language of TVA's enabling act, stating that TVA "[m]ay sue and be sued in its

corporate name," 16 U.S.C. § 831c(b), has the effect of "making the TVA liable to

suit in tort *subject to certain exceptions*."  *United States v. Smith*, 499 U.S. 160, 168-

69 (1991) (emphasis supplied) (citing *Peoples National Bank of Huntsville, Alabama*

*v. Meredith*, 812 F.2d 682, 684-85 (11th Cir. 1987)); *see also Queen v. Tennessee*

*Valley Authority*, 689 F.2d 80, 85 (6th Cir. 1982).  As the U.S. District Court for the

Eastern District of Tennessee observed:

> "Sue and be sued" clauses are presumed to be broad waivers of
> sovereign immunity unless it is "clearly shown that certain types of suits
> are not consistent with the statutory or constitutional scheme, [and] . .
> .  an implied restriction of the general authority is necessary to avoid
> grave interference with the performance of a governmental function, or
> that for other reasons it was plainly the purpose of Congress to use the
> 'sue and be sued' clause in a narrow sense."

*Mays*, 699 F. Supp. 2d at 1006 (quoting *FHA v. Burr*, 309 U.S. 242, 245 (1940) (footnote omitted)) (alteration in original); *see also Meyer*, 510 U.S. at 480-81 (quoting *Burr*, 309 U.S. at 245); *Loeffler v. Frank*, 486 U.S. 549, 554 (1988) (quoting *Burr*, 309 U.S. at 245).

While the "sue and be sued" clause in TVA's enabling statute constitutes a broad waiver of sovereign immunity, the Eleventh Circuit has held that "TVA cannot be subject to liability when engaged in certain governmental functions." *Peoples National Bank of Huntsville*, 812 F.2d at 685 (citing *Queen*, 689 F.2d at 85); *see also Edwards v. Tennessee Valley Authority*, 255 F.3d 318, 322 (6th Cir. 2001) (noting that "in certain limited situations the TVA is exempt from liability arising out of the exercise of wholly governmental functions, where the TVA acts solely as the Government's agent and where the United States itself would not be liable") (quoting *Queen*, 689 F.2d at 86).  This so-called "'nonliability' doctrine is applied when the subject governmental function is discretionary."  *Peoples National Bank of Huntsville*, 812 F.2d at 685 (citing *Morris v. Tennessee Valley Authority*, 345 F. Supp. 321 (N.D. Ala. 1972)); *see also J.H. Rutter Rex Manufacturing Company, Inc. v. United States*, 515 F.2d 97 (5th Cir. 1975).[58]

---

[58] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

"This exemption from liability for certain 'wholly governmental functions' has been analyzed pursuant to the same analysis as that applied to the immunity resulting from the discretionary function doctrine of the FTCA." *Mays*, 699 F. Supp. 2d at 1007. *See also, e.g., Edwards*, 255 F.3d at 322; *Peoples National Bank of Huntsville*, 812 F.2d at 685 (applying the discretionary function doctrine to TVA).

Plaintiff urges this court not to apply the discretionary function doctrine to her claims because the conduct upon which her claims is based grew out of TVA's generation of electrical power — in other words, commercial, non-governmental conduct — and, as such, plaintiff argues that it is not conduct for which TVA should enjoy immunity.[59]   In response, TVA contends that "the discretionary function doctrine applies to TVA's power program activities, including its power generation activities, just as it applies to TVA's other authorized programs."[60]

Courts have found TVA not liable for conduct related to flood control and navigation, because Congress explicitly authorized TVA to perform such duties as part of the agency's primary purpose and functions. *Mays*, 699 F. Supp. 2d at 1008 (citing *Queen*, 689 F.2d at 85-86); 16 U.S.C. § 831 (1933).

In addition, Congress specifically addressed TVA's authority "[t]o produce,

---

[59] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 24.

[60] Doc. no. 103 (Defendant's Reply Brief in Support of Summary Judgment on Discretionary Function Grounds), at 3.

distribute, and sell electric power" in 16 U.S.C. § 831d(*l*) (1933), and provided that

it could "acquire, operate, and maintain lands and structures to carry out the purposes

of the TVA Act." *Mays,* 699 F. Supp. 2d at 1008 (citing 16 U.S.C. §§ 831c(h)-(i)

(1933)) (alteration in original).

The Eleventh Circuit affirmed the application of the discretionary function

doctrine to TVA's statutorily-authorized, power-production activities, including

management decisions at a TVA coal-fired power plant, in *Johns v. Pettibone Corp.*,

843 F.2d 464, 467 (11th Cir. 1988).  That opinion held that TVA's decision to

delegate safety responsibilities to an independent contractor was a discretionary

decision giving rise to governmental immunity. *Id.* at 466-67. *Accord Edwards*, 255

F.3d at 320 (affirming a district court's application of the discretionary function

doctrine to the dangers of power-generation "created by the discharge of water

through . . . hydroelectric turbines"); *Queen*, 689 F.2d at 84-85 (holding that

statements made by a TVA employee regarding TVA's power production were within

the discretionary function doctrine); *Mays*, 699 F. Supp. 2d at 1009 (applying the

discretionary function doctrine to the activities of a coal-fired power plant); *Hill v.

TVA*, 842 F. Supp. 1413, 1420 (N.D. Ala. 1993) (noting that the acts of TVA

employees in the operation of Browns Ferry clearly were governmental in nature, as

"TVA is authorized to operate and control its nuclear power facilities") (citing 16

U.S.C. §§ 831c, 831f; *Three Tracts of Land*, 377 F. Supp. 631).

When urging this court to distinguish between those activities of TVA that are commercial in nature and those that are purely governmental, and to apply the discretionary function doctrine only to the latter, plaintiff asks the court to follow the holding of the United States Court of Appeals for the Fourth Circuit in *North Carolina ex rel. Cooper v. Tennessee Valley Authority*, 515 F.3d 344 (4th Cir. 2008). In that case, a divided panel of the Fourth Circuit declined to allow TVA the benefit of the discretionary function doctrine in a tort case involving emissions from some of the Authority's fossil fuel plants, because "TVA's power-generating activities are commercial in nature and thus not immune to suit." *Id*. at 350 n.4.[61]

There are two reasons for not adopting plaintiff's argument for the extension of the holding of the Fourth Circuit in the previous case as it pertains to the facts of this case. Primarily, the Fourth Circuit's holding in *North Carolina* is contrary to the Eleventh Circuit's binding decision in *Johns v. Pettibone*, which upheld the application of the discretionary function doctrine to TVA's power-production activities — albeit in connection with the operation of a coal-fired power plant, as

---

[61] The dissenting member of the panel in *North Carolina* would have found the discretionary function doctrine applicable to TVA's power-production activities. *See North Carolina*, 515 F.3d at 354-55 ("I cannot conclude, that in authorizing the TVA 'to sue and be sued,' Congress intended to traverse separation of powers principles and authorize a State suit against a federal agency questioning the fundamental decisions of the federal government to create the TVA and build coal plants to provide energy and thereby inherently authorize some emissions that are within federal and state regulatory standards.") (Niemeyer, J., concurring in part and dissenting in part).

contrasted to a nuclear facility:  a distinction that this court does not believe should work a difference in the decision.  *See Johns*, 843 F.2d at 467.  Further, as the Eastern District of Tennessee stated in a persuasive opinion,

> this Court will not parse the conduct or activities of TVA into the distinct categories of commercial and governmental conduct because the application of such distinct categories are bound to lead to disparate and inconsistent results.  *Indian Towing Co. v. United States*, 350 U.S. 61, 65, 76 S.Ct. 122, 100 L. Ed. 48 (1955), *affirming, In re Texas City Disaster Litigation*, 197 F.2d 771 (5th Cir. 1952) (*en banc*) (refusing to apply a governmental or commercial distinction because "it would push the courts into the 'non-governmental' — 'governmental' quagmire that has long plagued the law of municipal corporations"); *see also United States v. S.A. Empresa de Viacao Aerea Rio Grandense* ("*Varig Airlines*"), 467 U.S. 797, 812, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984).  This is especially so when, as here, the challenged conduct and activities are in furtherance of a function that TVA is explicitly authorized to perform by the TVA Act — namely, electric power production and distribution.  *See* 16 U.S.C. § 831d(*l*).

> In sum, [this court] will consider TVA's status as a governmental agency and instrumentality, and whether its conduct in these cases was in furtherance of activities, a purpose, and a function that TVA was statutorily authorized to pursue.  Because TVA was authorized by Congress to "produce, distribute, and sell electric power," 16 U.S.C. § 831d(*l*), and to use and develop technology for the generation of electric power, Congress made the governmental choice of authorizing TVA to provide communities with various types of electric power.  Such conduct in a federally created agency and instrumentality — the exercise of a statutorily authorized purpose — constitutes the exercise of a "governmental function" to which the discretionary function doctrine applies.  Accordingly, [this court] will apply the discretionary function doctrine to TVA and its conduct relating to its power production purpose and function, thus encompassing the challenged conduct in th[is] case[].

*Mays*, 699 F. Supp. 2d at 1009-10 (alterations supplied) (footnote omitted).

Thus, because Congress authorized TVA to "produce, distribute, and sell electric power," this court finds that such conduct constitutes a governmental function to which the discretionary function doctrine may apply. *See* 16 U.S.C. § 831d(*l*) (1933); *Mays*, 699 F. Supp. 2d at 1009.

## A.    The *Gaubert* Test

The Supreme Court observed that the discretionary function doctrine "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense*, 467 U.S. 797, 808 (1984) ("*Varig Airlines*"); *see also Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir. 1993) (same).[62]

The Supreme Court's decision in *United States v. Gaubert*, 499 U.S. 315 (1991), established a two-part test for determining whether challenged governmental conduct falls within the scope of the discretionary function exception to liability, and insulates the governmental agency from liability. The Eleventh Circuit has described the two prongs of the *Gaubert* test as follows:

---

[62] The district court opinion in *Autery* stated that the Congressional decision to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort" was grounded in separation of powers principles. *Autery*, 992 F. Supp. 2d at 1526 (quoting *Varig Airlines*, 467 U.S. at 814).

We must first determine whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice. *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 1273-74, 113 L. Ed. 2d 335 (1991). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee had no rightful option but to adhere to the directive.'" *Id*. at [322], 111 S. Ct. at 1272 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 1958, 100 L. Ed. 2d 531 (1988)).

"'[E]ven assuming the challenged conduct involves an element of judgment,'" however, we then must determine if the challenged actions are the kind of conduct "'that the discretionary function exception was designed to shield.'" *Id*. (quoting *Berkovitz*, 486 U.S. at 536, 108 S. Ct. at 1958); *see also Phillips v. United States*, 956 F.2d 1071, 1075 (11th Cir. 1992). The conduct must be "grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at [325], 111 S. Ct. at 1275. In *Gaubert*, the Court discussed the type of conduct that would be considered grounded in judgment or choice but not in developing or carrying out public policy.

> [If a governmental official] drove an automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decision in exercising that discretion can hardly be said to be grounded in regulatory policy.

*Id*. at [325] n. 7, 111 S.Ct. at 1275 n.7.

*Autery*, 992 F.2d at 1526-27 (alterations in original).

"In sum, the discretionary function doctrine insulates the government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Mays*, 699 F. Supp. 2d at 1010 (quoting *Berkovitz*, 486 U.S. at

537).

> The appropriate analysis of the discretionary function doctrine is not whether a decision was made that *involved* policy considerations of a social, economic, or political type — as virtually every decision of a large federal agency and instrumentality such as TVA might.  Rather, the appropriate analysis is whether the particular decision or set of decisions giving rise to the conduct are *grounded* in such policy considerations.  *Gaubert*, 499 U.S. at 323, 111 S. Ct. 1267 (emphasis added).    To this end, the Supreme Court has recognized that discretionary decisions are not limited to decisions involving policymaking or planning functions, but that "[d]ay-to-day management" type decisions, such as those that "regularly require[] judgment as to which of a range of permissible courses is the wisest []" may also constitute discretionary decisions.  *Id*. at 324-25, 111 S. Ct. 1267.  Further, it is the nature of the conduct in question that should be analyzed to determine whether it is of the type that Congress sought to protect, *Id*. at 322, 111 S. Ct. 1267, and whether such conduct can be said to be "based on the purposes that the regulatory regime seeks to accomplish."  *Id*. at 325 n.7, 111 S. Ct. 1267.

*Id.* at 1016-17 (alterations and emphasis in original).

Before addressing whether the discretionary function doctrine applies to the conduct challenged by plaintiff in this case, the first step is to "determine exactly what conduct is at issue."  *Autery*, 992 F.2d at 1527.

TVA divides plaintiff's claims into the following categories:  claims that TVA failed "to adequately warn Plaintiff Barbara Bobo of the inherent dangers of asbestos contamination"; and, claims that "TVA caused Plaintiff to be exposed to asbestos through exposure to her husband and his work clothes."[63]  Plaintiff does not dispute

---

[63] *See* doc. no. 70 (Defendant's Brief in Support of Summary Judgment on Discretionary

TVA's characterization of her claims and, therefore, it will be adopted for purposes of the discussion that follows.

**B**.   **TVA's Failure to Adequately Warn Plaintiff of the Dangers of Asbestos**

TVA asserts that its decision not to warn the spouses of TVA employees about the dangers of exposure to airborne asbestos fibers that collected on the employee or his work clothes satisfies both steps of the *Gaubert* test.[64]

TVA first argues that plaintiff's complaint does not identify any mandatory federal statute, regulation, or policy that specifically required TVA to warn the spouses of its employees about such dangers; and that, to TVA's knowledge, there were no federal statutes, regulations, or policies that placed a mandatory duty on TVA to do so, thus satisfying the first part of the *Gaubert* test.[65]

TVA next asserts that the second part of the *Gaubert* test is also satisfied, because the decision of whether to warn spouses  was "clearly susceptible to the weighing of policy considerations."[66]

Plaintiff's response to TVA's motion for summary judgment does not cite any specific statute, regulation, or policy that required TVA to warn the spouses of TVA

Function Grounds), at 5 (alteration supplied); doc. no. 1 (Complaint) ¶¶ 67, 69(a)-(e).

[64] *See* doc. no. 70 (Defendant's Brief in Support of Summary Judgment on Discretionary Function Grounds), at 13-14.

[65] *Id.* at 14; doc. no. 68 (Declaration of Christopher D. Jeter) ¶ 6.

[66] Doc. no. 70 (Defendant's Brief in Support of Summary Judgment on Discretionary Function Grounds), at 15.

employees about the dangers of exposure to airborne asbestos fibers that may have collected on the employee or his work clothes.[67]

Because the discretionary function doctrine is considered a challenge to the court's subject matter jurisdiction, plaintiff bears the burden to "establish that the discretionary function exception does not apply." *Cranford v. United States*, 466 F.3d 955, 958 (11th Cir. 2006). *See also OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) ("In the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists.") (citing *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942)). Plaintiff failed to meet her burden as to her failure to warn claim.

Further, TVA's decision not to warn spouses was clearly susceptible to policy considerations. As described in *Gaubert*, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325 (alteration supplied); *see also Cranford*, 466 F.3d at 958 ("Our inquiry does not focus either on the subjective intent of the agent or on whether the agent actually weighed policy considerations.")

---

[67] *See* doc. no. 82 (Plaintiff's Brief in Opposition of Summary Judgment on Discretionary Function Grounds); doc. no. 103 (Defendant's Reply Brief in Support of Summary Judgment on Discretionary Function Grounds), at 4.

(citations omitted); *OSI*, 285 F.3d at 950-51 ("The exception does not require there to have been actual 'weighing of policy considerations.'") (citing *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997)); *Autery*, 992 F.3d at 1530-31.

Several courts have held that failing to warn members of the public about the dangers of exposure to a particular hazard is susceptible to the weighing of policy considerations and, thus, within the discretionary function exception.  For example, in *Bowman v. United States*, the Navy's failure to warn the public of the unsafe condition created by its burial of toxic chemicals on government property that was later sold was found to be "susceptible to the balancing of political, economic, and social factors."  *Bowman v. United States*, 848 F. Supp. 979, 985 (M.D. Fla. 1994).  The court noted that the Navy did not decide to issue a warning and then do so negligently; instead, the Navy chose to issue no warning at all.  *Id*. at 986.  Even if the failure to issue a public warning was deemed to be a negligent act, the court found that the discretionary function doctrine applied, because to find otherwise would require the court "to substitute its judgment for that of the Navy as to what safety precautions [were] warranted."  *Id*. (alteration supplied).

Following similar reasoning, numerous courts have held that the discretionary function doctrine applies to bar claims based upon a theory of failure to warn about the dangers of asbestos exposure resulting from governmental activities.  *See, e.g.*,

34

*Sea-Land Service Inc. v. United States*, 919 F.2d 888, 892 (3d Cir. 1990) ("The government's failure, both during and after war, to warn of the potential health risks of asbestos [on government operated ships] once it learned of them was a matter susceptible to policy analysis and within the discretionary function exception.") (alteration supplied); *In re Joint E. & S. Districts Asbestos Litigation*, 891 F.2d 31, 38 (2d Cir. 1989) ("[W]e find that the government's failure to adopt a safety program to warn of asbestos-related dangers on board [government operated] ships in the midst of World War II is covered by the discretionary function exception.") (alterations supplied); *Lively v. United States*, 870 F.2d 296, 298 (5th Cir. 1989) (affirming the district court's decision that the discretionary function doctrine precluded liability to GSA's decision "to proceed with a program [of stockpiling asbestos] without warning of the hazards of the substance to which it was exposing the public") (alteration supplied); *Gordon v. Lykes Brothers Steamship Co., Inc.*, 835 F.2d 96, 100 (5th Cir. 1988) ("The government's decision not to establish a safety program for seaman working with asbestos was a similar choice [protected by the discretionary function doctrine].") (alteration supplied). *See also Morgen v. U.S. Department of Navy*, 323 F. App'x 515, 516-17 (9th Cir. 2009) (affirming a district court's application of the discretionary function doctrine to the Navy's failure to warn naval shipyard employees about the dangers of asbestos exposure).

35

Accordingly, this court holds that plaintiff has failed to produce evidence showing that the discretionary function doctrine should not apply to bar her claim that TVA failed to adequately warn her of the dangers of exposure to airborne asbestos fibers carried into her home on the person of her husband or his work clothes.  Thus, TVA's decision not to issue a warning to the spouses of TVA employees falls within the scope of the discretionary function doctrine, and plaintiff's failure to warn claim is due to be dismissed.

## C. TVA's Failure to Provide Appropriate Safety Measures and Protection, Thereby Leading to Plaintiff's Continued Exposure to Asbestos Through the Laundering of Her Husband's Work Clothes

Plaintiff also contends that TVA was obligated to comply with OSHA regulations concerning asbestos exposure, as well as TVA's internal asbestos policies,[68] but that TVA repeatedly violated both sets of standards.[69]  For those reasons, plaintiff asserts that TVA's enforcement of the OSHA regulations and its own internal policies "involv[ed] day-to-day operations . . . not covered by official immunity."[70]  She also alleges that TVA acted negligently when implementing its asbestos safety policies, which she argues is nondiscretionary conduct for which TVA

---

[68] Doc. no. 1 (Complaint) ¶¶ 67(e), 69(b), (e); doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 29.

[69] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 14-20, 29.

[70] Id. at 27-28 (alteration supplied).

36

should be held liable.[71]   In response, TVA asserts that the discretionary function doctrine should apply, because decisions concerning safety levels for government activities involve an exercise of discretion.[72]

TVA's focus on its decision to set particular safety levels governing an employee's exposure to asbestos is too broad, because a governmental agency like TVA has the discretion to adopt or not adopt a particular safety protocol.  *See, e.g., Gaubert*, 499 U.S. at 323 (noting that "planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs"); *Dalehite v. United States*, 346 U.S. 15, 37-38 (1953), *affirming In re Texas City Disaster Litigation*, 197 F.2d 771 (5th Cir. 1952) (*en banc*) (holding that both the cabinet-level decision to implement a fertilizer program and the decisions setting specific requirements for manufacture of the fertilizer were discretionary).  The proper inquiry is whether any statute, regulation, or agency guideline specifically dictated a course of conduct that TVA was obligated to follow.  *See Autery*, 992 F.2d at 1527.

On the other hand, plaintiff's focus is too narrow when she argues that the discretionary function doctrine should not apply because the conduct at issue is

---

[71] *Id*. at 28-29.

[72] Doc. no. 70 (Defendant's Brief in Support of Summary Judgment on Discretionary Function Grounds), at 17.

"operational." In support of that contention, plaintiff relies upon an Eleventh Circuit case holding that the implementation of "safety regulations is a day-to day operation," and that "such operational acts are not discretionary . . . ." *Andrews v. Benson*, 809 F.2d 1537, 1542-43 (11th Cir. 1987), *vacated by Andrews v. Benson*, 817 F.2d 1471 (11th Cir. 1987), and *reinstated by Andrews v. Benson*, 845 F.2d 255 (11th Cir. 1988); *see also Franks v. Bolden*, 774 F.2d 1552, 1555 (11th Cir. 1985). The Eleventh Circuit confronted similar arguments in a more recent case, however, and observed that:

> The Supreme Court squarely rejected this proposed distinction in *Gaubert*, ruling that the Fifth Circuit "erred in holding that the [discretionary function] exception does not reach decisions made at the operational or management level." *Gaubert*, 499 U.S. at [325], 111 S. Ct. at 1275. "Discretionary conduct is not confined to the policy or planning level." *Id*.; *see also Varig Airlines*, 467 U.S. at 813, 104 S. Ct. at 2764 ("[I]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case.").

*Autery*, 992 F.2d at 1527-28 (alterations in original).

Therefore, the appropriate inquiry for this court is whether controlling statutes, regulations, or TVA's own, internal policies mandated that the Authority reduce and monitor the exposure of its employees to airborne asbestos fibers in a specific manner. *See, e.g., Berkovitz*, 486 U.S. at 536 (stating that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically

prescribes a course of action for an employee to follow"); *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997); *Autery*, 992 F.2d at 1528; *Mays*, 699 F. Supp. 2d at 1011.

Plaintiff's response to TVA's motion for summary judgment alleges numerous violations of OSHA regulations and internal TVA policies and procedures.[73]   In response, TVA asserts that the factual underpinnings of plaintiff's allegations "are disputed, but . . . [the factual disputes] are not material to [the resolution of] the narrow [legal] issues presented by TVA's motion."[74]

Furthermore, as previously noted, plaintiff also asserts that TVA acted negligently in its implementation of such policies and, therefore, the discretionary function doctrine should not apply.[75]   The Supreme Court was confronted with similar contentions in the *Indian Towing* case, where the plaintiff sued the government for damages allegedly caused by the Coast Guard's negligent operation and maintenance of a lighthouse.  *Indian Towing Co. v. United States* , 350 U.S. 61, 62 (1955).  The Supreme Court held that, while the initial decision to provide and maintain a lighthouse was a discretionary judgment, the failure to maintain that lighthouse in

---

[73] Doc. no. 82 (Plaintiff's Brief in Opposition of Summary Judgment on Discretionary Function Grounds), at 14-20.

[74] Doc. no. 103 (Defendant's Reply Brief in Support of Summary Judgment on Discretionary Function Grounds), at 1 (alterations supplied).

[75] Doc. no. 82 (Plaintiff's Brief in Opposition of Summary Judgment on Discretionary Function Grounds), at 28-30.

proper working order was not such a decision, because it did not involve a permissible exercise of policy judgment.  *Id*. at 69.  The Supreme Court depicted the scope of the discretionary function doctrine in the following manner:

> [T]he Coast Guard need not undertake the lighthouse service.  But once it exercised its discretion to operate a lighthouse . . . and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in working order . . . and to repair the light or give warning that it was not functioning.  If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the [Federal] Tort Claims Act.

*Id.  See also*, *e.g.*, *Caplan v. United States*, 877 F.2d 1314, 1316 (6th Cir. 1989) (noting that once the government established a policy of deforestation, it was accountable for negligence in the implementation of such policy); *In re Tennessee Valley Authority Ash Spill Litigation*, No. 3:09-CV-09, 2012 WL 3647704, at *52 (E.D. Tenn. Aug. 23, 2012) ("[O]nce a government agency makes a policy decision protected by the discretionary function doctrine, the agency must then proceed with care in the implementation of that decision) (citing *Mays*, 699 F. Supp. 2d at 1019) (alteration supplied).

   With those basic principles in mind, this court now will address the various elements of plaintiff's claim that TVA failed to provide appropriate safety measures and protection, thereby leading to her exposure to airborne asbestos fibers carried into her home on the person of her husband and his work clothes.

### 1.      Permissible exposure limits

Plaintiff alleges that TVA violated OSHA regulations establishing permissible levels of exposure to airborne asbestos fibers.[76]  She argues that the TVA's adoption of Standard Practice 14.45 at the Browns Ferry facility on October 15, 1980,[77] was not in compliance with OSHA regulations, because that standard established an exposure limit of 5 fibers/cc (*i.e.*, per cubic centimeter), while OSHA regulations set the permissible exposure level at 2 fibers/cc.[78]

As stated in Part II.C of this opinion, *supra*, Executive Order 12,196 specifically required federal agencies to comply with OSHA regulations.  *See* 45 Fed. Reg. 12,769 (Feb. 26, 1980).  In 1980, the OSHA standard for permissible exposure levels to asbestos was 2 fibers/cc.  29 C.F.R. § 1910.93a(b)(2) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975).

Accordingly, on the record presently before the court, and construing the facts in the light most favorable to plaintiff, the non-moving party, the court finds that TVA *did* violate OSHA regulations setting a mandatory, numeric limit for employees' exposure to asbestos fibers.  TVA's failure to comply with the exposure limit mandated by OSHA is not protected by the discretionary function doctrine, because

---

[76] *Id*. at 14-20.

[77] See the discussion in Part II.F.3, *supra*.

[78] *Id*. at 14 (citing doc. no. 86-1 (Deposition of Christopher D. Jeter), at 97-98).

TVA's implementation of its Standard Practice 14.45 was in direct violation of a mandatory OSHA directive.  Accordingly, summary judgment on this aspect of plaintiff's claim is due to be denied.

### 2.   Monitoring of employees' exposure levels

OSHA and TVA each established standards that governed the means of monitoring and determining the quantity of airborne asbestos fibers in a work environment.  Those standards were explicated in Parts II.E and F of this opinion, *supra*, but are summarized below.

OSHA's 1972 standards required "all determinations of airborne concentrations of asbestos fibers [to] be made by the membrane filter method at 400-450x (magnification) (4 millimeter objective) with phase contrast illumination." 29 C.F.R. § 1910.93a(e) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975) (alteration supplied).  OSHA regulations also dictated that air monitoring occur within 6 months of the initial publication of the regulatory standard, and repeated every six months thereafter for exposed employees. 29 C.F.R. § 1910.93(f) (1972).  Such samples were to be collected on "membrane filters of 0.8 micrometer porossity mounted in an open-face filter holder . . . ." *Id*.  Each employer was required to maintain records of "any personal or environmental monitoring required by this section" for a period of at least three years.  29 C.F.R. § 1910.93(*i*) (1972).

TVA Hazard Control Standard 407 required at least semi-annual monitoring of both the breathing zone of exposed employees, and of the work environment that would "*quantitatively determine airborne asbestos fiber concentration.*"[79] Additionally, Standard 407 required the maintenance of "records of personal monitoring and environmental monitoring."[80]

Plaintiff's response to defendant's motion for summary judgment alleges several violations of the foregoing standards.[81]  For example, Jimmy Myhan, a co-worker of plaintiff's husband, testified during his deposition that he did not remember participating in or observing air monitoring for asbestos.[82]  Further, plaintiff asserts that TVA has not produced any evidence of air sampling at Browns Ferry prior to October of 1979.[83]  Plaintiff has also provided evidence addressing the manner in which such monitoring was conducted.   From 1974 to 1978, Browns Ferry determined employee exposure concentrations through *visual inspections* by the employee's supervisor.[84]  There is no evidence that the supervisors were provided any

---

[79] Doc. no. 68-1 (TVA Hazard Control Standard 407), at 5 (emphasis supplied).

[80] *Id.* at 6.

[81] *See* doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 14-16.

[82] Doc. no. 83-4 (Deposition of Jimmy Myhan), at 74.

[83] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 14 (citing doc no. 85-1 (Deposition of Christopher D. Jeter), at 58, 62; doc. no. 91-2 (Spreadsheet of Air Sampling)).

[84] *Id.* (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 80-81).

standards to guide their determinations.[85]   If the supervisor believed that the employee's exposure did not exceed the ceiling limit of 10 fibers/cc, then the employee was not given special clothing or lockers.[86]

The record before the court shows  that TVA conducted air monitoring of only three employees in 1980, eight employees in 1981, and five in 1982, even though TVA's own policy required sampling of all exposed employees.[87]  Thus, plaintiff asserts that, until at least the early 1980s, many employees at Browns Ferry were not being monitored for exposure to airborne asbestos fibers in violation of the regulations.[88]  Plaintiff also asserts that TVA has provided no proof that it conducted air sampling of exposed employees every six months, or that the method of air sampling mandated by OSHA was ever used at Browns Ferry.[89]

In determining whether TVA violated a mandatory statute, regulation, or policy, the court must consider the time period from 1975 to the promulgation of Executive Order 12,196 in 1980 separately from the time period following that Executive Order (that is, 1980 to 1985).

---

[85] *Id*. (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 97-98).

[86] *Id*. at 15 (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 81, 96).

[87] *Id*. (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 85, 86).

[88] *Id*. (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 87).

[89] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 15-16 (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 100-01, 103, 121).

For the time period from 1975 to 1980, before Executive Order 12,196 made OSHA regulations directly applicable to TVA, the Authority's decision to adopt a particular monitoring method is immune under the discretionary function doctrine. *Dalehite*, 346 U.S. at 40-41 (holding that the decision to bag fertilizer at a particular temperature was within the discretionary function exception); *Johns*, 843 F.2d at 467 ("[S]afety decisions represent an exercise of discretion giving rise to governmental immunity.") (alteration supplied).  Thus, TVA's initial determination as to how it would monitor airborne concentrations of asbestos fibers in Hazard Control Standard 407 would be shielded from liability by the discretionary function exception.

Even so, plaintiff does not attack TVA's initial policy decision underlying the adoption of Hazard Control Standard 407.  Instead, she challenges TVA's failure to follow either its own standard or OSHA requirements concerning the monitoring of employees' exposure levels.  Both regulations required TVA to monitor an employee's exposure level to asbestos, and to retain records of those exposure levels.[90]  Therefore, this court finds that TVA violated mandatory monitoring directives and, as such, is not entitled to protection from liability by the discretionary function doctrine for such conduct during the period of 1975 to1980.

In the alternative, this court also finds that TVA's decisions regarding the

---

[90] OSHA regulations only required the maintenance of such records for a period of three years.  TVA Hazard Control Standard 407 did not contain a similar time limitation.

monitoring of airborne asbestos exposure levels were not grounded in policy considerations and, therefore, protection under the discretionary function doctrine is not warranted.  Similar to the situation addressed by the Supreme Court in the *Indian Towing* case, once TVA exercised its discretion to establish a procedure requiring bi-annual monitoring of the breathing area of exposed employees and working environments that quantitatively determined the airborne asbestos concentration level, it was obligated to implement such monitoring in a non-negligent manner.  *See generally Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955).  Plaintiff has pointed to several ways in which TVA was negligent in carrying out the requirements of its own Hazard Control Standard 407.  For instance, plaintiff has presented evidence showing that TVA did not conduct bi-annual inspections of *all exposed employees*, and that plant supervisors were negligent in performing visual inspections because they did *not quantitatively determine* the airborne asbestos concentration level.  While Hazard Control Standard 407 allowed room for discretion in how to specifically measure the airborne concentration levels, a visual inspection by plant supervisors must be deemed negligent, because such an inspection could only lead to a subjective, *qualitative*, and not a *quantitative*, determination.

Further, the decision to not *quantitatively* monitor the concentration of airborne asbestos fibers to which all employees were exposed cannot be construed to be based

46

on nuclear power production, the very purpose of Browns Ferry. *See Gaubert*, 499 U.S. at 325 n.7. Thus, this court cannot find, as a matter of law, that TVA's decision to not *quantitatively* monitor the concentration of airborne asbestos fibers to which all employees were exposed was grounded in policy considerations. *See Gaubert*, 499 U.S. at 325; *Mays*, 499 F. Supp. 2d at 1021 (noting that "it would not constitute a discretionary decision to decide whether to follow or act pursuant to [] policies and procedures") (alteration supplied). For those reasons, the court finds that TVA's actions in monitoring employees' asbestos exposure levels from 1975 to 1980 are not within the scope of the discretionary function doctrine.

Likewise, for the time period from 1980 through 1985, TVA was subject to all OSHA regulations, including specific requirements as to which membrane filters were to be used, and the frequency with which air samples had to be taken from exposed employees. *See* 29 C.F.R. § 1910.93a (e)-(f) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975). Therefore, any decisions by TVA as to the monitoring of exposure levels would not be grounded in policy considerations, and would not be the type of conduct that Congress sought to protect. *Gaubert*, 499 U.S. at 322-23. Rather, any such decisions would merely address the issue of whether to follow the governing OSHA regulations and TVA internal policies. *Mays*, 499 F. Supp. 2d at 1021. As such, those decisions would not fall within the scope of the discretionary

47

function doctrine, and TVA is not shielded from liability on those claims.

### 3.    Protective equipment and clothing and locker rooms

Browns Ferry was subject to internal TVA policies during the period from 1975 to 1980, and the Plant also was subject to both internal TVA policies and OSHA regulations during the period from 1980 through 1985.[91]  OSHA regulations required respirators, special work clothing, changing rooms, and two clothes lockers for employees whose exposures exceeded the prescribed limits.   29 C.F.R.  §§ 1910.93a(c), (d) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975).  TVA also had established numerous internal policies.   TVA Hazard Control Standard 407, Paragraph 4.5.1.1(D) required the use of respirators  "*prior to determining the airborne concentrations of asbestos in a work environment*."[92]   Additionally, protective clothing was required for exposures exceeding the ceiling limit, and "*for exposures of undetermined concentrations* until it [had] been proven by tests that the activity [would] not produce concentrations above the ceiling limits."[93]   Hazard Control Standard 407 also contained requirements mandating that TVA provide special clothing, changing rooms, and two separate lockers when employees were

---

[91] *See* doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment), at 4-10.

[92] *Id*. at 7; doc. no. 68-1 (TVA Hazard Control Standard 407), at 3-5 (emphasis supplied).

[93] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment), at 7; doc. no. 68-1 (TVA Hazard Control Standard 407), at 3-5 (emphasis and alterations supplied).

exposed to asbestos concentrations exceeding the ceiling limit.[94]  TVA's Division of Nuclear Power promulgated a Safety and Hazard Control Manual in 1979 that established the following standard:   "*Each employee exposed to airborne concentrations of asbestos shall be provided with two separate lockers.*  One locker shall be used for street clothes and must not be contaminated with asbestos."[95]

Plaintiff's response to defendant's motion for summary judgment alleges numerous violations of the aforementioned policies.  Jimmy Myhan, a laborer who worked at Browns Ferry with plaintiff's husband, testified in his deposition that employees normally wore their street clothes *to* work, *at* work, and when they returned home, *unless* the employee had worked in an area contaminated with radiation.[96]  Plaintiff asserts that TVA has proffered no evidence showing that its internal policies requiring the provision of protective clothing were ever enforced.[97]  Plaintiff further asserts that, if Browns Ferry was not providing two lockers to all exposed employees as of 1979, that would constitute a violation of the policy

---

[94] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment), at 7; doc. no. 68-1 (TVA Hazard Control Standard 407), at 5.

[95] Doc. no. 86-4 (Tennessee Valley Authority Division of Nuclear Power Safety and Hazard Control Manual), at ECF 18 (emphasis supplied); doc. no. 85-1 (Deposition of Christopher D. Jeter), at 110-111.

[96] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 16 (citing doc. no. 83-4 (Deposition of Jimmy Myhan), at 70-71).

[97] *Id*. (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 97).

contained in the Division of Nuclear Power Safety and Hazard Control Manual.[98]
Additionally, plaintiff claims that TVA failed to produce documentation showing it
followed its 1974 policy requiring protective clothing for employees exposed to
"undetermined concentrations" of asbestos.[99]

Despite the foregoing allegations, plaintiff has not met her burden under part
one of the *Gaubert* test.  While she has pointed out that TVA proffered no evidence
of compliance with such standards, that is simply not enough to find as a matter of
law that TVA violated its mandatory internal procedures concerning protective
equipment and clothing and locker rooms.  Therefore, TVA's conduct as it pertains
to those policies must now be analyzed under the second part of the *Gaubert* test.

As explained above, once TVA exercised discretion in adopting certain
procedures regarding protective equipment, clothing, and locker rooms, it was
required to implement such procedures in a non-negligent manner.  *See Berkovitz*,
486 U.S. at 538 n.3; *Indian Towing Co.*, 350 U.S. at 69; *Mays*, 499 F. Supp. 2d at
1019-20. Similar to the policies and procedures analyzed in Part III.C.2, *supra,* the
decisions of whether to provide employees with respirators and protective clothing
when the prescribed limits were exceeded (or prior to determining the airborne

---

[98] *Id*. (citing doc. no. 85-1 (Deposition of Christopher D. Jeter), at 110).

[99] *Id*. at 17 (citing doc. no. 86-1 (Deposition of Christopher D. Jeter), at 34); *see* doc. no. 68-1
(TVA Hazard Control Standard 407), at 3-5.

concentration level) and whether to provide two separate locker rooms for each exposed employee, are not decisions that involve the requisite exercise of discretion. *See Gaubert*, 499 U.S. at 325; *Mays*, 499 F. Supp. 2d at 1021.  Such decisions are merely questions of whether to follow governing policies and procedures and, thus, they are not appropriately grounded in policy considerations.  For those reasons, the court finds that the discretionary function doctrine will not preclude liability for such decisions, and summary judgment is due to be denied on those claims.

### 4.   Medical examinations

Browns Ferry was subject to both OSHA and internal TVA policies mandating annual medical examinations for all employees exposed to airborne asbestos fibers. *See* 29 C.F.R. § 1910.93a(j)(3) (1972), *recodified as* 29 C.F.R. § 1910.1001 (1975); doc. no. 68-1 (TVA Hazard Control Standard 407), at 6.

In addition, Paragraph 4.10.3 of TVA Hazard Control Standard 407 imposed a mandatory duty to retain records of such examinations "for a period of 20 years."[100] Plaintiff focuses upon this record-retention requirement as a means of proving that TVA violated the policies mandating annual medical examinations for employees exposed to airborne asbestos fibers.  She argues, based upon the fact that TVA could produce records of only three medical exams during Mr. Bobo's employment,[101] the

---

[100] Doc. no. 68-1 (TVA Hazard Control Standard 407), at 6.

[101] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary

Authority must have violated the policies mandating annual medical examinations cited in the first paragraph of this subsection.  That argument is weakened, however, by Mr. Bobo's deposition, during which he testified that, to the best of his memory, he had a chest x-ray every year.[102]

The primary fact that would give rise to a cause of action for violation of the policies cited in the first paragraph of this subsection would be evidence establishing that TVA failed to conduct annual medical examinations for all employees exposed to airborne asbestos fibers.  The policy mandating retention of records of such examinations is a clerical requirement that could serve as circumstantial evidence that the primary requirement was, or was not, complied with.  Here, however, plaintiff has only shown that TVA did not produce evidence establishing its compliance with the requirement to retain records of annual medical examinations; yet, Mr. Bobo's own deposition testimony indicates that the most important component of such an examination (*i.e.*, a chest x-ray) was conducted annually.   The evidence is contradictory.  For that reason, the court finds that the question of whether TVA conducted medical examinations of all employees exposed to airborne asbestos fibers during all of the years that plaintiff's husband worked for the Authority presents a

---

Function Grounds), at 18 (citing doc. no. 83-3 (Deposition of Priscilla Carthen), at 71-73, ECF 36 (Exhibit 10)).

[102] Doc. no. 83-2 (Deposition of James Bobo), at 60.

genuine issue of material fact.

Even so, plaintiff's claim still must be analyzed under the second part of the *Gaubert* test.  As explained in Part III.A, *supra*, the discretionary function doctrine shields from liability the discretionary decisions made by a governmental agency.  *See Gaubert*, 499 U.S. at 323-325; *Mays*, 699 F. Supp. 2d at 1016-17.  The use of the term "shall" in both the OSHA regulation and TVA's Hazard Control Standard 407 clearly made the requirement to provide annual medical examinations to all employees exposed to airborne concentrations of asbestos fibers mandatory, not discretionary.  Therefore, TVA's decision as to whether it would comply with those policies is not the type of decision due protection under the discretionary function doctrine.  *See Gaubert*, 499 U.S. at 324-25; *Berkovitz*, 486 U.S. at 537; *Varig Airlines*, 467 U.S. at 814, *Mays*, 499 F. Supp. 2d at 1021.

The bottom line, however, is that the evidence of TVA's compliance, or lack of compliance, with that non-discretionary, mandatory requirement to conduct annual medical examinations of all employees exposed to airborne asbestos fibers is conflicting.  Hence, summary judgment is not appropriate on this claim.

### 5.   Lack of training

Plaintiff presented evidence of only a single 1984 internal TVA memorandum that discussed asbestos training requirements.  The memorandum states that all

employees who could "reasonably be expected to be exposed above a TWA [*i.e.*, 'Time-Weighted Average'] of 0.1 f/cc" must be identified and receive initial and annual training.[103]

In support of her allegations that TVA failed to train its employees about the hazards of asbestos exposure, plaintiff asserts that TVA has no documentation indicating Mr. Bobo received any asbestos training.[104]  Additionally, Jimmy Myhan testified in his deposition that he never received any asbestos training at Browns Ferry.[105]  In both 1979 and 1982, OSHA conducted a review of TVA and noted that additional employee training on the hazard control program should be provided.[106]

As with many of the alleged violations, the fact that TVA has not produced documentation evincing compliance with a particular regulation or procedure does not establish, as a matter of law, that TVA in fact failed to comply with that requirement.  Even though the OSHA report indicated that additional employee training was warranted, that does not conclusively prove that TVA violated a mandatory directive.  Therefore, the court finds that plaintiff's allegations must be

---

[103] Doc. no. 82 (Plaintiff's Brief in Opposition to Summary Judgment on Discretionary Function Grounds), at 9 (citing doc. no. 90-3 (Memorandum by W.F. Willis), at 2) (alteration supplied).

[104] *Id*. at 19 (citing doc. no. 86-1 (Deposition of Christopher D. Jeter), at 115, 117; doc. no. 83-3 (Deposition of Priscilla Carthen), at 66).

[105] *Id*. (citing doc. no. 83-4 (Deposition of Jimmy Myhan), at 73).

[106] *Id*. at 20 (citing doc. no. 91-5 (1979 Evaluation Report), at 40-42).

analyzed under the second part of the *Gaubert* test.

Even though the 1984 internal memorandum provided for initial and annual training of employees who could reasonably be expected to be exposed to asbestos concentrations above a time-weighted average of 0.1 f/cc, it gave no guidance or requirements for such training.[107]   Therefore, TVA enjoyed significant discretion as to the implementation, scope, and contents of such training.   Such decisions were clearly susceptible to policy analysis.  *See Gaubert*, 499 U.S. at 325; *Cranford*, 466 F.3d at 958; *OSI*, 285 F.3d at 950-51; *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001) (holding that the discretionary function doctrine applied to the city's decision as to how to train its police officers); *Kelly v. United States*, 241 F.3d 755, 755 (9th Cir. 2001) (finding that "[t]he extent and type of the Forest Service's flight training is a matter left to the agency's discretion and is susceptible to policy analysis") (alteration supplied);  *Autery*, 992 F.3d at 1530-31; *Flynn v. United States*, 902 F.2d 1524, 1531 (10th Cir. 1990) ("There being no fixed standards for training . . . the conduct of the federal employees falls within the discretionary function of the FTCA."); *Feyers v. United States*, 749 F.2d 1222, 1227 (6th Cir. 1984) (holding that the decision not to establish a safety training program for rail-yard workers was within the discretionary function exception).

---

[107] *Id.*

Accordingly, the court finds that TVA's decisions concerning employee asbestos training fall within the scope of, and are protected from liability by, the discretionary function doctrine.

## IV.  CONCLUSIONS AND ORDERS

For the foregoing reasons, TVA' first motion for summary judgment (doc. no. 69) is GRANTED in part and DENIED in part.  The motion is GRANTED as to plaintiff's claims that TVA filed to warn her about the dangers of asbestos exposure (Part III.B, *supra*), and, plaintiff's claims that TVA failed to provide asbestos training to its employees (Part III.C.5, *supra*).  It is ORDERED that those claims be, and the same hereby are, DISMISSED.  The motion is DENIED as to plaintiff's claims that TVA:  violated OSHA regulations concerning permissible levels of asbestos exposure (Part III.C.1, *supra*); failed to follow mandatory directives governing the monitoring of an employee's exposure to asbestos (Part III.C.2, *supra*); failed to provide protective equipment and clothing and locker rooms (Part III.C.3, *supra*); and, failed to administer annual medical examinations to employees exposed to airborne asbestos fibers (Part III.C.4, *supra*).

As noted at the beginning of this opinion, this court entered an order on October 18, 2013, granting plaintiff's motion to reconsider the previous denial of her

motion for leave to amend her complaint,[108] and directing the Clerk to file plaintiff's "First Amended Complaint."[109]   That amendment had the effect of expanding the period of time during which plaintiff contends that she was exposed to airborne asbestos fibers brought into her home on the person and clothing of her deceased husband by a period of some twelve years.   That amendment necessitated the entry of another order on October 21, 2013, directing the parties to file an amended scheduling order by November 12, 2013,[110] to address the possibility that additional discovery may be required before TVA's second motion for summary judgment will be ripe for decision.[111]   The parties are ORDERED to inform this court in their proposed, amended scheduling order of not only the date on which they anticipate that TVA's second motion for summary judgment will be ripe for decision, but also whether additional briefs in support of and opposition to that motion will be required.

**DONE** and **ORDERED** this 28th day of October, 2013.

_____
United States District Judge

---

[108] *See* doc. no. 71 (Motion for Leave to Amend Complaint), doc. no. 75 (Memorandum Opinion and Order denying motion to amend), doc. no. 77 (Motion for Reconsideration), and doc. no. 170 (Order Granting Motion for Reconsideration).

[109] *See* doc. no. 170, at 2.  *See also* doc. no. 171 (First Amended Complaint).

[110] *See* doc. no. 173.

[111] *See* doc. no. 122 (TVA's second Motion for Summary Judgment).